# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI SOUTHWESTERN DIVISION

DIANA M. FIELDS,                        )
                                        )
                        Plaintiff,      )
                                        )
              v.                        )         Civil Action
                                        )         No.  06-5095-CV-SW-JCE
                                        )
THE STATE OF MISSOURI, DEPT. OF         )
ECONOMIC DEVELOPMENT, DIVISION          )
OF WORKPLACE DEVELOPMENT,               )
                                        )
                        Defendants.     )

## ORDER

Pending before the Court is defendant's motion for summary judgment [Doc. # 24] , to which plaintiff has responded.  [Doc. # 33]  Defendant has replied to that response.  [Doc. # 38] For the reasons set forth herein, it will be ordered that defendant's motion for summary judgment be granted.

Plaintiff Diana Fields has filed race discrimination and retaliation claims against defendant under Title VII.  In her petition, she alleges that she was discriminated against on the basis of her race, an African American female, because defendant treated her less favorably in terms and conditions of her employment than defendant treated white employees.  She asserts that the race discrimination and disparate treatment she was subjected to included refusing to allow her the right and privilege to engage in activities the same as white employees in the same position and title.  She also alleges that defendant harassed her by forcing her to drive enormous distances to job shadow with regional managers who held less seniority than plaintiff, knowing

1

that she had physical limitations, which had a negative impact on her health, thereby sabotaging
her employment, hoping this would discourage her to terminate her employment.  She also
contends that defendant harassed her by questioning her work performance after she had been a
regional manager for 3.9 years, and never administered a performance appraisal to her to assess
her work performance.  It is plaintiff's contention that defendant harassed her by asserting
intimidation tactics, "alter egoistic proxies," telling her to disregard her feelings in light of
consideration for a "WIB-Workforce Investment Board" member, who in-turn called plaintiff "a
stupid bitch." [Plaintiff's Petition at 3].  She contends that defendant retaliated against her
because she filed a formal complaint with the Department of Economic Development, The
Division of Workforce Development, citing claims of discrimination.  Specifically, she contends
that defendant imposed excessive discipline on her by demoting her to a previous position she
had held; by reducing her current management salary; and by transferring her to another agency
(region of the state), out of her domicile, thereby creating an adverse condition for plaintiff.  She
also alleges that these actions created a hostile work environment, subjecting her to
discriminatory acts, by exposing personnel data to other employees before she knew of any such
changes in the terms and conditions of employment.  She asserts that defendant violated her due
process rights under the Human Resources Management Policy, by not allowing her the same
rights and privileges to enforce contracts as white employees in the same position.  She asserts
that she was discriminated against, harassed, and retaliated against by being forced under duress
and coercion to endorse documents developed under false pretenses.  Plaintiff contends she was
discriminated against by being terminated on July 31, 2006; that she opposed the discriminatory
actions and unlawful practices by complaining to management about the actions of defendant's

employees, and no corrective action was taken. As a result of defendant's conduct and actions, plaintiff contends she has suffered lost wages and benefits of employment, has incurred attorney's fees and the cost of litigation, and has undergone pain and suffering. It is her position that defendant's conduct was with malice and reckless indifference to her right not to be discriminated against because of her race, and that punitive damages are warranted.

Defendant moves for summary judgment on the following grounds: that plaintiff's work environment was not objectively hostile against her race; that she cannot establish a prima facie case of disparate treatment under Title VII because she was not meeting employer expectations; and that she cannot establish a prima facie case of retaliation because the Department had decided to terminate or demote her before she filed her grievance, and no materially adverse action was taken against plaintiff after filing her grievance. Because plaintiff cannot establish a prima facie case of discrimination or hostile work environment based on race, or a valid retaliation claim, and because she was not meeting defendant's legitimate expectations, defendant contends that it is entitled to summary judgment as a matter of law.

## I. Hostile Work Environment/Disparate Treatment Claims

### Standard of Review

There are well-settled principles in ruling a summary judgment motion. Summary judgment is appropriate when there is no genuine issue of material fact present in the case and judgment should be awarded to the party seeking the motion as a matter of law. Fed. R. Civ. P. 56(c). E.g., Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Pierce v. Marsh, 859 F.2d 601, 603 (8th Cir. 1988).

As the Supreme Court reiterated in Celotex, the summary judgment procedure "is

properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy and inexpensive determination of every action."  477 U.S. at 327.  Under Federal Rule of Civil Procedure 56(c), the Court can enter summary judgment only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to summary judgment as a matter of law."  Because summary judgment is a drastic remedy, however, it should not be granted unless the moving party has established the right to a judgment with such clarity that there is no room for controversy.  Umpleby v. United States, 806 F.2d 812, 814 (8th Cir. 1986). In addition, the party opposing summary judgment motions may not rest upon the allegations in the pleadings.  The nonmovant must resist the motion by setting forth specific facts showing there is a genuine issue of fact for trial.  Fed. R. Civ. P. 56(e); Buford v. Tremayne, 747 F.2d 445, 447 (8th Cir. 1984).  A genuine issue of material fact exists if: (1) there is a dispute of fact; (2) the disputed fact is material to the outcome of the case; and (3) the dispute is genuine, that is, a reasonable jury could return a verdict for either party. The moving party has the burden of proving that these requirements have been met. Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970).

In ruling on motions for summary judgment, the Court must give the nonmoving party all reasonable inferences that can be drawn from the underlying facts.  Fischer v. NWA, Inc., 883 F.2d 594, 598-99 (8th Cir. 1989), cert. denied, 495 U.S. 947 (1990).  The nonmoving party must, however, resist a summary judgment motion by setting forth specific facts that show there is a genuine issue of fact for trial.  Fed. R. Civ. P. 56(e); Burst v. Coors,  650 F.2d 930, 932 (8th Cir.

1981). The motion may then be granted only if there is no substantial evidence in support of that party's position.

The Eighth Circuit has stated that summary judgment should be used sparingly in the context of employment discrimination and/or retaliation cases where direct evidence of intent is often difficult or impossible to obtain. Haas v. Kelly Services, Inc., 409 F.3d 1030, 1034-35 (8th Cir. 2005). It has also stated, however, that no separate summary judgment standard exists for discrimination or retaliation cases and that such cases are not immune from summary judgment. See Berg v. Norand Corp., 169 F.3d 1140, 1144 (8th Cir. 1999) ("there is no `discrimination case exception' to the application of Fed. R. Civ. P. 56, and it remains a useful pretrial tool to determine whether or not any case, including one alleging discrimination, merits a trial").

Plaintiff has alleged race discrimination in violation of Title VII. The Eighth Circuit uses the direct evidence framework of Price Waterhouse v. Hopkins, 490 U.S. 228, 258 (1989), and alternatively, the indirect evidence, burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-803 (1973), to determine whether a submissible case has been presented by the plaintiff. An employee can produce direct evidence of discrimination that demonstrates "a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the adverse employment action." Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004). If a plaintiff presents no direct evidence of discrimination, the Court must analyze the claim pursuant to the burden-shifting framework set forth in McDonnell Douglas to establish an inference of unlawful discrimination. Tenge v. Phillips Modern Ag Co., 446 F.3d 903, 907 (8th Cir. 2006).

Case 3:06-cv-05095-JCE   Document 46   Filed 09/18/08   Page 5 of 31

Under the Price-Waterhouse test, if a plaintiff can produce evidence that directly reflects that an illegitimate criterion was a motivating factor in the employment decision, the burden of persuasion shifts to the defendant. It is then defendant's burden to prove that the same decision would have been made, even if it had not taken the illegitimate criterion into account. Stacks v. Southwestern Bell Yellow Pages, Inc., 996 F.2d 200, 202 (8th Cir. 1993). It is clear that "direct evidence" can actually include direct or circumstantial evidence, presented by plaintiff, which is sufficient to support a finding that an illegitimate criterion actually motivated the challenged decision. Id. at 202.

Typically, to establish a prima facie case of race discrimination, a plaintiff must prove that he or she was a member of a protected group, was performing adequately on the job, and was terminated or otherwise suffered adverse employment action under circumstances giving rise to an inference of discrimination. See Craik v. Minnesota State Univ. Bd., 731 F.2d 465, 469 (8th Cir. 1984). The law does not require that a plaintiff demonstrate replacement by a person outside any protected class to establish a prima facie case. See Williams v. Ford Motor Co., 14 F.3d 1305, 1308 (8th Cir. 1994). A prima facie case, although a minimal showing, at least requires the plaintiff to show that the employer's actions were more likely than not based on a consideration of impermissible factors. Leichhman v. Pickwick Intern., 814 F.2d 1263, 1270 (8th Cir.), cert. denied, 484 U.S. 855 (1987). If a plaintiff successfully establishes a prima facie case, the defendant has the burden of producing some legitimate nondiscriminatory reason for the alleged discriminatory action. Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 254 (1981). Once the employer meets its burden, the plaintiff may win by pointing to evidence which, if believed, would expose the employer's reason as a mere pretext for

6

intentional discrimination.  St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993).

Only decisions made on the prescribed basis of race may be challenged under Title VII, and only those plaintiffs who can show a factual basis, which relates the challenged action or inaction to discrimination, can survive summary judgment.  The particular facts that must be proved to establish a prima facie case necessarily will vary with differing factual situations.  Hall v. American Bakeries Co., 873 F.2d 1133, 1134 (8th Cir. 1989).  Those facts and allegations will determine the appropriate legal framework at the prima facie stage. Hillebrand v. M-Tron Industries, Inc., 827 F.2d 363, 368 (8th Cir. 1987).

In terms of a claim of discriminatory harassment, Title VII only reaches such conduct if it is severe or pervasive enough to alter the conditions of employment. The objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive.  Harris v. Forklift Systems, Inc., 510 U.S. 17,  21-22 (1993). Sporadic or casual comments are unlikely to support a hostile environment claim.  See Cram v. Lamson & Sessions Co., 49 F.3d 466, 474 (8th Cir.1995).  The conduct must be looked at as a whole in addition to the individual comments or acts. "A work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it `into a series of discrete incidents.' " Hathaway v. Runyon,  132 F.3d 1214, 1222 (8th Cir. 1997) (quoting Burns v. McGregor Elec. Indus. Inc., 955 F.2d 559, 564 (8th Cir. 1992) ).  A number of factors are relevant in assessing the magnitude of harassment, including the frequency and severity of the discriminatory conduct, whether it is physically threatening or humiliating or only an offensive utterance, whether it unreasonably interferes with the employee's work performance,  the physical proximity to the harasser, and the presence or absence of other

7

people.  <u>Carter v. Chrysler Corp.</u>, 173 F.3d 693, 701-02 (8th Cir. 1999).

Discussion

The record indicates that plaintiff began working for the Department of Labor in 1973; she was laid off in 1984; rehired within the Division of Employment Security in 1995; and in 1999, was transferred to the Department of Economic Development, Division of Workforce Development ["DWD"].   She worked for DWD from then until August 1, 2006.  In 2002, she was promoted to regional manager at the Joplin office.  One of the agencies with which DWD worked was the Workforce Investment Board ["WIB"], which is where Jasen Jones, a subject of this lawsuit, worked.  He became executive director of the WIB after plaintiff returned to work from a long-term disability, and still holds that position.  As part of her job, it was necessary for plaintiff to work with WIB.  In 2005, Rod Nunn replaced Rick Beasley as Director of DWD. Mr. Nunn is African American.  During plaintiff's employment, two other regional managers employed by DWD were African American, and there was an African American employee at the Joplin Career Center.

Plaintiff alleges that she meets the elements of a prima facie case for race discrimination because she was a member of a protected class under Title VII; that she performed her job at a level that met or exceeded her employer's legitimate expectations; and that she was subjected to adverse employment actions, including being demoted, transferred, and being terminated.

<u>Hostile work environment</u>.

In defendant's summary judgment motion, it is alleged that, in terms of plaintiff's claim of race discrimination, being called a "stupid bitch" on a single occasion was not extreme and is not evidence of intent to discriminate against her on the basis of race.  It is noted that the

Case 3:06-cv-05095-JCE   Document 46   Filed 09/18/08   Page 8 of 31

speaker, Jasen Jones, was not a state employee, but rather, was employed by a non-profit organization, with which defendant was required to work.  Defendant asserts that the yelling occurred when Jones disagreed with plaintiff over matters concerning WIB business. Defendant's Director Beasley met with plaintiff after the disagreement, and accepted her explanation for the steps she had taken.  It is also asserted that Steve Kraus, an Assistant Director, talked to Jones after plaintiff complained, traveling to Joplin with Director Nunn to meet with her, as well as Jones and Trotter.  Additionally, defendant asserts that in 2004 it fired a DWD employee, Jeffrey Lipp, shortly after he accused plaintiff of being racist and a bigot and threatened her.  Because it took prompt and effective action, defendant contends that, as a matter of law, it cannot be held liable for Lipp's behavior by terminating his employment within one week after plaintiff notified them of the incident.  Defendant submits that plaintiff has testified that, other than Lipp, she has never heard any DWD employee make any racially motivated statements or use any racial slur.  She also testified that in her conversations with other African-American regional managers with DWD, none of them ever indicated the existence of racial tension in their offices.  Because there is no evidence that Jones' calling plaintiff a "stupid bitch" occurred because of her race, defendant asserts that she has not made out a prima facie case of Title VII hostile work environment, and that it is entitled to summary judgment on this claim.

Plaintiff contends that her work environment became objectively hostile when Robert Ruble did nothing to protect her from the rude behavior of Jasen Jones.  She admits, however, that Jones was not an employee of defendant's.  She asserts that his yelling and calling her a "stupid bitch" was embarrassing and could be heard by all of her employees. Plaintiff suggests that Ruble could have taken more aggressive action to have Jones reprimanded; instead she

contends that Ruble complained to his superiors that she was out of line. It is her position that being required to travel out of town for a week at a time to stay in St. Joseph, Missouri, was unreasonably hostile, especially when she was not learning anything and was replaced in Joplin by Robert Trotter, whom she had previously complained about as being insubordinate. Plaintiff contends that she was shuffled around to different job sites and was threatened with being terminated if she did not cooperate. She asserts that her authority was undermined and it was virtually impossible for her to return to her previous employment. It is also her position that the working environment was subjectively hostile due to the destruction of her relationship with her employees, but also because the job shadowing occurred during the holidays and during a time when she had a child with problems in school.

Disparate Treatment.

In regard to plaintiff's claim of disparate treatment under Title VII, it is defendant's position that she cannot establish a prima facie case because she was not meeting employer expectations. Defendant contends that plaintiff was placed on a performance plan in October of 2005. Under the policy that DWD adopted in May of 2005, all DWD employees were required to have a performance development plan, following a review of the employee's interpersonal and professional skills, designed to provide the training necessary to improve or develop competencies, skills, and performance. During July and August of 2005, plaintiff's supervisor received complaints from partner agencies about Fields, as well as complaints from Jasen Jones and DWD Joplin Career Center staff. These included: that plaintiff was a barrier to service integration at the Career Center; that she prevented Trotter from interacting with partner staff; that she was always negative during WIB and partner meetings; and that she discouraged change

or innovation. Her performance development plan addressed her need to improve interpersonal skills; develop and maintain relationships; to improve listening and effectiveness of oral communication; improve decision-making; and promote teamwork by facilitating cooperation and trust, through additional training, including job shadowing another regional manager. Defendant submits that plaintiff had previously job shadowed two regional managers during her probationary period of employment; that the performance development plan was not an adverse action because she continued to attend DWD management and strategic meetings; and that she received the same salary, title, and benefits during this period. It is defendant's position that plaintiff cannot show that she was meeting employer expectations because of lack of communication and failure to demonstrate a high level of initiative to improve working relationships with her subordinate supervisor, Robert Trotter, and with Jasen Jones.

It is also submitted that during her performance development plan period, plaintiff began to inaccurately report time that she was on sick leave and annual leave, and she arrived late and left early when job shadowing. Given these performance deficiencies during this time period, she was not meeting DWD's expectations. On January 3, 2006, DWD assistant directors were in the process of drafting a dismissal letter based on plaintiff's lack of progress under her performance plan. By January 5, she was being considered for a demotion, rather than termination. While she was demoted, defendant contends that there is no evidence that she was discriminated against because of her race, and that she cannot demonstrate that she was treated less favorably than similarly situated employees outside her protected group. Because she cannot set forth a prima facie case of disparate impact, defendant submits that it is entitled to summary judgment as a matter of law.

11

Plaintiff has responded to the summary judgment motion, asserting that there is evidence from which the fact finder could conclude that her supervisor, Robert Ruble, was racially biased. This is based on statements he made indicating that he possessed stereotypical beliefs with respect to African Americans and their work ethic, as expressed during a conversation with Anita Bartholomew. a DWD employee, on January 25, 2006. Plaintiff contends that because of this bias, when a dispute arose between plaintiff and her subordinate, Robert Trotter, Ruble assumed that plaintiff was at fault. Additionally, when a disagreement arose between plaintiff and Jasen Jones, who was with an agency with which she was required to cooperate in order to place clients in job training programs, Ruble ignored the offensive treatment that Jones exhibited toward plaintiff and removed her from having any contact with Jones' organization, thereby inhibiting her ability to perform her duties. Plaintiff also contends that when defendant introduced a policy of job development, Ruble unilaterally prepared a performance review critical of her performance, despite the fact that the initial plan was not designed to be a performance review, and despite the fact that the agency required the development plan to be designed by the employee, not the supervisor. She contends that, as a result, Ruble influenced her supervisors to approve the plan, which was nothing more than disciplinary action in that it required her to engage in job shadowing of other managers who were at the same level as plaintiff, and required her to travel away from the office on numerous occasions when Ruble knew she had physical limitations that prevented her from driving long distances. Regarding the discrepancies in her time records, she asserts that Ruble knew that her physical condition prevented her from engaging in inter-city travel within the time frames he approved, and he failed to report to his superiors that he had approved her absences or received detailed

explanations from her regarding the alleged discrepancies. Therefore, plaintiff asserts that the fact finder could reasonably conclude that the ultimate decision makers, Sarah Schuette, the Human Resources Manager, and Rod Nunn, the Director, were led to believe that she was not performing adequately when they made the decision to demote her.

Regarding the conversation between Ruble and Bartholomew, which plaintiff asserts demonstrates racial bias, Bartholomew tried to speak to Ruble about a complaint she had. Allegedly, Ruble stated to Bartholomew that Trotter and Fields did not get along; that plaintiff was using Bartholomew; and that plaintiff's grievance had not been properly filed because she failed to follow through with it. He then told Bartholomew that plaintiff did not have the skills to be a regional manager. Ruble stated that there were comments that plaintiff was racist towards customers. He told Bartholomew about reading a black history book so that he could learn more about "their culture perspectives and views," and then made several comments about black individuals having an infatuation with white people's hair. He also said that plaintiff's behavior was embarrassing to another African American employee, and that plaintiff had been babied by the previous director.

In order to survive the summary judgment motion, plaintiff must establish a prima facie case of race discrimination by proving that she was a member of a protected group, was performing adequately on the job, and was terminated or otherwise suffered adverse employment action under circumstances giving rise to an inference of discrimination. Craik, 731 F.2d at 469. Although a minimal showing, a prima facie case at least requires plaintiff to show that the employer's actions were more likely than not based on a consideration of impermissible factors. Leichhman, 814 F.2d at 1270.

13

In her deposition testimony, plaintiff stated that, despite differences of opinion, she could not say whether her communications with Jasen Jones were negative or positive. She could not say if she raised any concerns about Jones when she met the new director, Nunn, but admitted that she did raise concerns about Robert Trotter to Ruble at the state meeting in 2005. She expressed concerns about Trotter's relationship with Jones because Trotter was supervisor of the Workforce Development Staff, who was supposed to be the "right-hand person to work with [her]." [Plaintiff's Deposition at 54]. She thought he became insubordinate towards her and was withholding information from her. Specifically, he did not inform her of the agenda of a meeting, he conducted training programs in a manner that caused her budget concerns; and there was an incident where a flag was not properly displayed. Plaintiff admitted that she approved Trotter for completion of his probation and to become a regular supervisor employee. She also admitted that there was a meeting with Director Nunn and Steve Kraus in July of 2005 in which the topic of Jones, Trotter, and her not working as cohesively as they should be was discussed. She recalled that they thought Jones was unhappy with her about a report she gave at a closed meeting, and he thought she should be reprimanded. She testified that things were said at the meeting that Jones overheard from other people that she had said and that she did recall that Steve Kraus said she "wasn't a mean-spirited person and he didn't see any reason to reprimand me or terminate me." [Depo. at 75]. She then gave them some information about Trotter being an insubordinate supervisor. She asked that he be transferred or removed from the office. When the directors met with the three together, they decided not to fire or reprimand her, because she had done nothing wrong, but they did give Trotter a temporary assignment to work in Jefferson City. And, it was decided that she would no longer participate in WIB functions as a member of

14

the executive board and a member of WIB. She took over as supervisor when Trotter was temporarily reassigned, which she felt was a hardship on her. She tried to get him permanently replaced in the office. Plaintiff also testified that personnel decisions were made public and her peers were inquiring about what was going on and was she going to be fired. Plaintiff believed that her work environment was hostile because of yelling that was overheard by staff, and the fact that she no longer felt welcome. It was her statement that she never felt any discrimination by former directors under whom she had worked. She said the trust began to chip away, over different times when there was a disagreement. She had never been yelled at by anyone until Jones yelled at her. On the first occasion, she questioned him about signing off on his expense account checks, which she reported to the WIB director. Jasen brought a letter to her in which he called her unprofessional. She felt that this affected her credibility and character because she was "the only black person maybe in the office and you supervise a white staff, you have to be believable." [Depo. 88]. She acknowledged that there was another African American employee in the DWD office. She did not recall if Ebony Robinson, that employee, ever complained to her about anything racially inappropriate in the office. On another occasion, Jones yelled at her when she had a disagreement with him over a proposal he had to buy a new building, and with which she disagreed. She stated that Jones was mad, red-faced, upset with her about the building situation, and yelled, "You stupid bitch." [Depo. 97]. Some other people heard this. She stated that he would not have referred this way to a white male, and that it sent "shock waves" through the office. [Depo. 102]. Other than these two instances of Jasen Jones becoming upset with her, all plaintiff could identify as creating a hostile work environment was that employees on the floor or upper level management did not support what she was saying. She testified that she sent

15

several emails about this problem with Jasen's temper, and recommended in one of them that he attend classes on controlling his temper. Plaintiff testified that Jasen Jones never used any racial slurs in her presence, other than the event to which she testified regarding the name calling. She agreed that WIB was not a agency of the state at the time, but was a subcontractor. She identified Jeffrey Lipp as an employee of the Department who had used a racial slur against her in 2005, and acknowledged that he was terminated. Other than these instances, plaintiff testified that there was no one who was actually an employee of defendant's who ever used racial slurs in her presence, nor did she know of any other instances when anyone complained about racially inappropriate remarks or conduct. She was aware of a grievance filed by Anita Bartholomew, in February of 2006, in which there was a negative racial stereotype supposedly said by Robert Ruble. Plaintiff did not know anything about that grievance until sometime in the summer of 2006. Inquiry was also made at the deposition about a complaint from a customer where plaintiff was alleged to have criticized the customer's husband for wearing a t-shirt with a Georgia or Confederate flag on it. The record indicates that the customer subsequently complained about her behavior. She admitted that she was not aware of any incident while she worked at the Department that an employee was disciplined or fired for engaging in any kind of harassment or discrimination, other than Lipp. [Depo. 171].

According to the sworn affidavit of Robert Ruble, the Regional Coordinator at DWD, and plaintiff's supervisor since the spring of 2003, he began to receive complaints about plaintiff in July and August of 2005 from local partner agencies, including the director Lakes Country, the Adult and Dislocated Worker Programs supervisor, and Jasen Jones of WIB. It was reported that she was a barrier to integration at the Joplin Career Center, was always negative during WIB and

partner meetings, discouraged change or innovation, and prevented Robert Trotter from interacting with partner staff. [Defendant's Exhibit C]. He created a time line documenting partners' complaints, as well as those from DWD employees, and included them in a "Recommendation to Transfer Diana Fields to Central Office." This was emailed to Deputy Division Director Steve Kraus and Schuette on September 19, 2005. In his affidavit, Ruble also indicates that plaintiff began a job shadowing assignment as part of her performance development plan during November and December, 2005, and January, 2006. He indicates that plaintiff did not inform him that she was taking sick leave on November 28 and 30th until December 9, 2005, after he emailed her. She did not submit sick leave slips until January 3, 2006. Ruble also noted several instances of discrepancies in the time that plaintiff claimed to be taking and when she was actually at work, which were reported to him by Shirley Click, of the Springfield office, and which he also observed on one occasion. These instances of discrepancies in requested leave time and time when she was working were substantiated by the sworn affidavit of Shirley Click. [Defendant's Exhibit D].

Turning first to plaintiff's complaint of a hostile work environment, in reliance on an alleged race-based conversation between Ruble and Bartholomew, and one rude remark by a person with whom she worked, but who was not an employee of defendant's, plaintiff has attempted to depict an atmosphere that was hostile to her. The Eighth Circuit has "distinguished between comments that demonstrate a "discriminatory animus in the decisional process" from "stray remarks in the workplace," "'statements by nondecision makers, or statements by decisionmakers unrelated to the decisional process.'" Madel v. FCI Management, Inc., 116 F.3d 1247, 1252 (8th Cir. 1997) (citation omitted).

In viewing the evidence in the light most favorable to plaintiff, it cannot be said that she has met the threshold requirement to establish a racially hostile work environment. The racially-based comment attributed to Ruble, was an off-hand, stray remark that occurred after the decision to demote her had been made. A generalized statement does not evince a discriminatory policy or practice, nor does it tend to establish that a prohibited factor was a basic for adverse employment action. See generally Wittenburg v. American Exp. Financial Advisors, 464 F.3d 831, 840 (8th Cir. 2006). Such a statement, without more, is insufficient to establish direct evidence that race was the motivating factor for action taken by her employer. While it was an insensitive and rude statement to make, that one statement by Ruble in a conversation with one other person, is simply inadequate, without more, to show that defendant's actions were more likely than not motivated by racial bias. Plaintiff has failed to establish that these remarks were related to the decisional process. Although patronizing and rude, they do not create a triable issue on the question of whether defendant's actions created a racially hostile environment.

Even coupled with the two yelling incidents with Jones, plaintiff's examples of what she believes to be evidence of racial animus fall far short of making a showing of a pervasively hostile work environment. In terms of the yelling and comment made by Jones, the Court finds that plaintiff "attributes more meaning to the allegedly discriminatory comments [] than they can be rightfully said to bear." Calder v. TCI Cablevision of Missouri, Inc., 298 F.3d 723, 730 (8th Cir. 2002). The alleged name calling, on one occasion, by a non-employee, which was not race-related, does not even rise to the level of the type of "stray remark" that the courts have held does not support a finding of pretext. Because there is no material factual dispute regarding

18

whether plaintiff was subjected to a racially hostile work environment, the Court finds that she has failed to establish a prima facie case on this claim.

Plaintiff also contends that being subjected to the performance development plan created a hostile work environment and constituted disparate treatment. While she alleges that Ruble stood in the way of her being recognized as adequately performing her job, the record contains complaints regarding her job performance from a number of separate sources and different agencies, many involving conflicts between plaintiff and Trotter. Regarding the performance development plan, plaintiff complains that the only input she had was providing her job description; that other employees did not start with a plan as early as she was required to; that she was told she had to sign the form or that she would be fired; that an assistant director and her supervisor presented the plan to her, which she felt coerced by.

A review of the record indicates that the Missouri Department of Economic Development issued the policy on the Performance Development Program on May 3, 2005; that it was implemented to assist employees in improving and developing professional competencies and skills; and that a supervisor is responsible for establishing the performance development plans for employees under their supervision. [Policy Statement, Exhibit 24-4, at 18-26]. Regardless of plaintiff's subjective belief that the performance development plan was racially biased, she has failed to point to any evidence, with the exception of Ruble's after-the-fact conversation with Bartholomew, to link the performance development plan and the job shadowing to any racial motivation. The fact that Ruble made a very racially-insensitive statement on January 25, 2006, is insufficient to demonstrate racial bias in the development and implementation of the plan, which was put into place for plaintiff on October 25, 2005. On the other hand, the record

19

contains several instances of complaints against Fields regarding her lack of communication and management skills and unprofessional behavior, which would lead a supervisor to encourage improvement of those skills. While plaintiff was obviously unhappy with the plan in that she did not want to job shadow, and did not want to drive to St. Joseph because of arthritis, problems with her son, and the fact that the holidays were approaching, none of those complaints have any bearing on whether defendant was treating her in a racially disparate manner. Additionally, the record indicates that the job shadowing was changed from St. Joseph to Springfield, to accommodate plaintiff's concerns about being away from home. Further, in response to plaintiff's complaints to Ruble about Trotter, he was moved to a different location in an attempt to resolve some of the friction that their working together was causing. The record indicates, therefore, that defendant attempted to work to resolve some of what appear to have been personality conflicts with plaintiff and other workers. Whether she liked the plan or agreed with the changes defendant implemented, plaintiff has failed to establish a material factual dispute regarding whether defendant's actions were racially motivated in establishing and implementing the plan or its other responses to workplace conflict. She has failed to present any evidence to establish that she was treated any differently than any other employee on the basis of race.

The record is clear that plaintiff clashed with Ruble over plaintiff's issues with Robert Trotter. Additionally, plaintiff admitted in her deposition that she had disagreements with some of the ways that Jasen Jones performed his job as director at WIB. Plaintiff's evidence, however, has failed to relate this tension to plaintiff's race or race-based discrimination on the part of Ruble or anyone else employed by defendant. It appears that the only evidence of race discrimination is plaintiff's belief that Ruble discriminated against her, and that Jones made a

20

statement based on race. "Evidence, not contentions, avoids summary judgment." See Haas, 409 F.3d at 1036 (citation omitted). Because there is no material factual dispute regarding whether plaintiff was subjected to disparate treatment, the Court finds that she has failed to establish a prima facie case on this claim.

The Court has reviewed the positions of the parties, the deposition testimony, and other exhibits in this case, as well as relevant case law. The law requires that the evidence be viewed in the light most favorable to the non-moving party. In this case, however, the Court finds that plaintiff has failed to establish a prima facie case of either a hostile work environment or disparate treatment.

Even assuming however, that plaintiff has established a prima facie case of race discrimination, and has therefore created a  rebuttable presumption of unlawful discrimination, the Court finds that defendant has met its burden of producing evidence of a legitimate, nondiscriminatory reason for demoting her.

The Court turns to whether defendant has proffered a legitimate nondiscriminatory reason under the McDonnell Douglas test for her demotion. Defendant contends that plaintiff was demoted  because of her unwillingness or inability to work cooperatively with other employees and other agencies, and because of noncompliance with requirements regarding annual or sick leave and accurate time records.

 Having carefully reviewed the reasons stated by defendant for plaintiff's demotion, the Court finds that it has produced evidence of  legitimate, nondiscriminatory reasons  for demoting her. The burden on defendant is one of production, rather than persuasion, and can involve no credibility assessment. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000). If

defendant meets its burden of production, the presumption of discrimination disappears, and plaintiff must show that the reasons for her demotion are pretext for race discrimination.

In this case, the Court finds that defendant has produced legitimate, nondiscriminatory reasons for demoting plaintiff, which have been set forth otherwise n this Order. Specifically, her employer believed she was not adequately performing her job because of evidence of lack of cooperation and an unwillingness to change, and her misuse of annual and sick leave. Regardless of plaintiff's efforts to challenge these various employment decisions, it cannot be said that these are not legitimate, nondiscriminatory reasons to terminate an employee.

Because defendant has met its burden of production, the presumption of unlawful discrimination disappears, and plaintiff can only avoid summary judgment if the evidence in its entirety creates a fact issue regarding whether defendant's proffered reasons were pretextual, and create a reasonable inference that race was a determinative factor in her demotion.

Regarding the documentation and use of leave, plaintiff contends that the excessive travel requirements of the performance development plan created health issues for her, and that she advised Ruble in advance of regular doctor's appointments, which had already been scheduled. She contends that it is untrue that she did not submit leave slips to her supervisor until January 3, 2006. Plaintiff asserts that any disparity in her leave time was due to a misunderstanding regarding how she was to count travel time to Springfield. She also submits that she did agree to amend her time sheets, and that the matter was resolved two days after it was raised, while nothing further was said about the situation and there were no further complaints about her job performance in this regard.

Plaintiff can only avoid summary judgment if the totality of the evidence creates a fact

22

issue as to whether defendants' proffered reasons are pretextual, and creates a reasonable inference that age was a determinative factor in the termination.  Haas, 409 F.3d at 1035.  "The ultimate burden of persuading the fact finder of intentional race discrimination [rests with plaintiff] at all times."  Id. at 1036. The law is clear that "[a] plaintiff may not merely point to unsupported self-serving allegations, but must substantiate her allegations with sufficient probative evidence that would permit a finding in her favor."  Haas, 409 F.3d at 1034 (citation omitted).  Further, as the courts have recognized, even in cases where a plaintiff has established a prima facie case and presented evidence that the proffered reasons for termination are pretextual, there will be cases where no rational fact finder could conclude that the action was discriminatory.  Reeves, 530 U.S. at 148;  Mayer v. Nextel West Corp., 318 F.3d 803 (8th Cir. 2003).  "It is not enough, in other words, to dis believe the employer; the fact finder must believe the plaintiff's explanation of intentional discrimination."  Id., at 808 (citation omitted).  "The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination."  Reeves, 530 U.S. at 153.

A thorough review of the record in this case convinces the Court that plaintiff has not carried her burden of establishing that the reasons given by defendant for her demotion are pretextual, and has not presented sufficient evidence to raise a reasonable inference that race was a determinative factor in her demotion and ultimate termination.  The Court must ask whether the evidence is sufficient to create a genuine issue of fact as to whether defendant intentionally discriminated against plaintiff because of her race.   This record is bereft of any suggestion that there was any pervasive race-based animus involved in the decision to demote plaintiff.  It can

Case 3:06-cv-05095-JCE   Document 46   Filed 09/18/08   Page 23 of 31

be concluded that any problems between plaintiff and Ruble, Trotter, and/or Jones were based on tension and not race; the reason for plaintiff's demotion was ultimately her failure to conform to the standards expected of a regional manager. Accepting all plaintiff's allegations as true, these alone fail to create a reasonable inference that defendant was discriminating against plaintiff on the basis of race.

After careful review, the Court finds that plaintiff has not produced evidence sufficient to raise an issue of material fact on whether defendant's proffered non-discriminatory reasons for demoting her were pretextual, and has failed to create a reasonable inference that race was a determinative factor in the adverse employment decision. Regardless of plaintiff's contentions regarding the reasons she believes she shouldn't have been transferred or demoted, her opinion regarding the performance development plan, and her explanation about the leave requests, the relevant, material facts in this case are not in dispute. Further, federal courts do not "sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgment involve intentional discrimination" of protected classes. Xylene Zhuang v. Datacard Corp., 414 F.3d 849, 855 (8th Cir.2005). The Court concludes that plaintiff has not presented evidence sufficient to create a triable issue on the question of pretext, and has failed to create a reasonable inference that race was a factor in her demotion.

Although there is no question that plaintiff is a member of a protected group, defendant contends and the record before the Court establishes that plaintiff has failed to meet the minimum threshold of showing that defendant's actions were more likely than not based on race. She has failed to raise material factual disputes regarding whether she was meeting defendant's

24

expectations and has failed to establish that she suffered disparate treatment because she was African American. Plaintiff has failed to set forth evidence that would allow an inference, as a matter of law, of intentional race discrimination. Therefore, defendant's motion for summary judgment on her race discrimination claim under the Title VII will be granted.

## II. Retaliation Claim

<u>Legal Standard</u>

Title VII of the Civil Rights Act of 1964 prohibits employers from taking adverse actions against employees in retaliation for employee reports of harassment or discrimination. 42 U.S.C. § 2000e-3(a). "A claim for retaliation is not based upon [prohibited] discrimination, but instead upon an employer's actions taken to punish an employee who makes a claim of discrimination." <u>Haas</u>, 409 F.3d at 1036. In general, as long as a plaintiff had a reasonable, good faith belief that there were grounds for a claim of discrimination or harassment, the success or failure of a retaliation claim is analytically divorced from the merits of the underlying discrimination or harassment claim. See <u>Foster v. Time Warner Entm't. Co.</u>, 250 F.3d 1189, 1195 (8th Cir.2001) (stating that a retaliation plaintiff " 'need not establish the conduct which she opposed was in fact discriminatory but rather must demonstrate a good faith, reasonable belief that the underlying conduct violated the law" ').

The Court applies the burden shifting framework set forth in <u>McDonnell Douglas</u> to analyze retaliation claims. The ultimate question in any retaliation case is whether the employer's adverse action against the employee was motivated by retaliatory intent, and the ultimate burden of proof or persuasion to show that the employer's conduct was motivated by retaliatory intent

25

remains at all times on the plaintiff. <u>Hicks</u>, 509 U.S. at 511.

To succeed under this analytical framework, the plaintiff must first present evidence sufficient to establish a prima facie case. <u>Hesse v. Avis Rent A Car Sys., Inc.</u>, 394 F.3d 624, 632 (8th Cir. 2005). There are three elements to a prima facie retaliation case. The plaintiff must demonstrate that she took part in protected conduct, that she was subjected to an adverse employment action, and that there exists a causal nexus between the protected conduct and the adverse action. <u>Id.</u> at 632. If a plaintiff sets forth a prima facie case, a presumption of retaliation arises and the burden of production shifts to defendant to articulate a legitimate, non-retaliatory reason for the adverse action. <u>Buettner v. Arch Coal Sales Co., Inc.</u>, 216 F.3d 707, 714 (8th Cir. 2000).

Discussion

Defendant asserts that summary judgment should be granted on the retaliation claim because, although plaintiff engaged in protected conduct when she filed a grievance with the Department on January 6, 2006, defendant had already made the decision to demote her before she filed the grievance. Therefore, it is asserted that she will be unable to establish a causal connection between her demotion and the protected conduct, and will be unable to establish a prima facie case of retaliation. Defendant also contends that under Missouri's applicable personnel regulations, an employee who is approved for long-term disability shall be deemed to have voluntarily resigned. Because, as a matter of law, she resigned before she was demoted, she cannot show that she suffered a materially adverse action.

The record indicates that plaintiff had applied for long-term disability benefits; when the application was approved, benefits were granted retroactively to February 17, 2006, a few weeks

Case 3:06-cv-05095-JCE   Document 46   Filed 09/18/08   Page 26 of 31

before defendant sent plaintiff the letter demoting her from her regional manager position. The Office of Administration found that plaintiff had resigned in good-standing before her demotion, based on her approval for long-term disability benefits. The Director of Personnel accepted her resignation on the basis of her receipt of long-term disability benefits in mid-February, 2006, and her benefits were based on her regional manager position and salary. Therefore, defendant contends that plaintiff resigned before she was demoted, and that she cannot show that she suffered a materially adverse personnel action.

It is also contended that defendant has presented legitimate, non-discriminatory reasons for her demotion. Because plaintiff cannot establish a valid retaliation claim, defendant contends that it is entitled to summary judgment as a matter of law.

Plaintiff contends that there is evidence that defendant had not made a determination to discipline or terminate her at the time of her complaint on January 6, 2006. She relies on the fact that defendant did not advise her of the action until March 6, 2006, which indicated that the demotion was to be effective April 16, 2006. It is her position that defendant waited to notify her of the decision to demote her until after the internal investigation was completed and her complaint found to be without merit. Because defendant waited until completion of the investigation, plaintiff contends that this was retaliation for having made the complaint. Further, she contends that her claim is for pain and suffering, and she had to wait many months after she received notice of her demotion and subsequent termination to receive the award of all her benefits, during which time she incurred more pain and suffering. Plaintiff further asserts that there is a sufficient causal connection in these adverse actions to satisfy a prima facie case because of the timing of the protected activity and the adverse employment action.

A review of the record indicates that plaintiff testified at the deposition that she thought the retaliation against her actually began when she started complaining about Jasen Jones, and the first act of retaliation was when Ruble "began to get nit-picky about what I was doing, where I was going." [Depo. 178]. She also referred to a January 4, 2006, email where Ruble informed her he had concerns about her time reporting, and she thought this was retaliatory. After that, she considered the demotion, the transfer, the reduction in salary, and the ultimate termination to be retaliatory.

At the outset, there is a question whether plaintiff's demotion constitutes adverse employment action, given that she received long-term disability benefits and was deemed to have voluntarily resigned on February 17, 2006, before she was notified of the demotion. She was eventually terminated on July 31, 2006, when she had depleted all her leave time under the Family and Medical Leave Act ["FMLA."]. Even assuming, however, that adverse employment actions did occur, the Court finds that plaintiff has failed to establish a causal connection. According to the sworn affidavit of Sarah Schuette, Human Resources Manager for the Department, she participated in a conference call with Robert Ruble, and Assistant Division Directors Dawn Busick, Donna Prenger, and Mark Bauer, on December 28, 2005, to discuss plaintiff's progress on her performance development plan. [Defendant's Exhibit H]. Ms. Schuette states that all participants agreed that plaintiff should be terminated, and she was asked to draft a dismissal letter, which she did. On January 3, 2006, she emailed a draft to the participants for their comments and review. On January 5, they discussed the option of demoting and transferring her, rather than terminating plaintiff from her employment. They agreed on this option, and Ms. Schuette drafted a revised letter on January 5, which she sent to the other

28

participants.  On April 4, 2006, Ms. Schuette received an email from plaintiff, with a March 28, 2006 doctor's statement attached, which indicated that she needed to be off work until further notice.  Ms. Schuette responded by letter on April 6, providing leave information to plaintiff under the FMLA., and asking her to provide additional information from a doctor by April 24, 2006, which she failed to do.  On May 1, 2006, Schuette sent plaintiff a letter notifying her that the Department had granted her FMLA leave from April 17, 2006 through July 12, 2006, if needed.  Plaintiff also received long-term disability benefits effective February 17, 2006, based on her salary as a regional manager.  The Director of Personnel accepted her resignation on the basis of her having received the long-term disability benefit, pursuant to State of Missouri Personnel Advisory Board Regulation 1 CSR 20-3.070 (6)(C).  On February 28, 2007, the Board dismissed plaintiff's appeal of her demotion on the basis that it was moot, given that she had received all the relief that could have been granted by the board.

    The record establishes that while plaintiff did not receive notice until March 6, 2006, that she was being demoted and transferred, the decision to demote her was made in December and early January of 2006.   In the notice, reasons were given for her demotion, which included her inability to demonstrate management skills; her lack of respect for employees under her supervision; her inability or unwillingness to work well with others; and her failure to demonstrate administrative skills.  The letter delineated in extensive detail the reasons for her demotion. [Director Nunn's Letter, Document 24-4, at 20-26].  She was allowed to appeal this decision, which she did.

    While plaintiff complains that she has established a causal connection between her protected conduct and her demotion because defendant did not issue the demotion letter until her

grievance was fully investigated, defendant asserts that the Division simply wanted to be fair and was willing to reevaluate decisions about plaintiff's employment or whether to demote her after he complaints had been properly investigated. It is contended that there was discussion about termination or demotion and the circulation of draft letters prior to her filing the grievance, and that this is evidence that defendant did not issue a demotion letter to her in retaliation for filing the grievance. Defendant also contends that plaintiff in her response does not appear to assert that her termination was retaliatory or an act of discrimination.

Based on a full review of the record, and construing the evidence in the light most favorable to plaintiff, the Court finds that she has failed to raise material factual disputes regarding whether she suffered adverse employment action in retaliation for having filed a grievance. The record establishes that plaintiff's performance was under review when the performance plan was implemented in October; that there were complaints about her use of leave time in November and December; and that meetings about her performance and the need to either terminate her or demote her began the end of December and continued until the 5th of January, 2006. Defendant admits that it did not take further action on the plan to offer her a demotion until the grievance process was complete. Further, plaintiff even admitted in her own testimony that she perceived defendant to be retaliating against her when she started complaining about Jasen Jones, and the first act of retaliation was when Ruble "began to get nit-picky." At that time, plaintiff had not filed a grievance, and would not have been engaged in protected conduct. While the timing of the notice was after the grievance had been decided, the record adequately supports defendant's position that the decision to demote her was made before she filed the grievance on January 6, 2006. Accordingly, plaintiff has failed to establish a causal

Case 3:06-cv-05095-JCE   Document 46   Filed 09/18/08   Page 30 of 31

connection between her protected conduct and defendant's employment action. It must, accordingly, be recommended that defendant's summary judgment motion on plaintiff's retaliation claim be granted.

<u>Conclusion</u>

Based on the foregoing, it is

ORDERED that defendant's Motion for Summary Judgment be, and it is hereby, granted.


 /s/ James C. England
JAMES C. ENGLAND, Chief
United States Magistrate Judge


Date:    9/18/08

31